IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH ROBERTS, et al. | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 23-832 |
| | : | |
| THE BOROUGH OF MANHEIM, et al. | : | |
| | : | |

McHUGH, J.                                                                                                                            April 9, 2024

**<u>MEMORANDUM</u>**

This is a civil rights action in which a white property owner claims that he was discriminated against by a municipality because he rented to a Hispanic tenant. Plaintiffs Joseph Roberts and Kim Zapata contend that the Borough of Manheim and its Zoning and Code Compliance Officer, Donna Czeiner, cited Roberts for trivial reasons with the intent to push Zapata's business out of the Borough. The Borough, according to Plaintiffs, did not make the same efforts to fine similarly situated white business owners, and so they claim an equal protection violation. With discovery now complete, I conclude that no reasonable jury could find that the Borough treated Plaintiffs differently from similarly situated businesses on the basis of Zapata's ethnicity. I must therefore grant Defendants' motion for summary judgment.

**I.    Factual Background**

In 2017, Plaintiff Roberts purchased 199 West Stiegel, an industrial zoned park with five separate buildings being leased to three tenants.[1] Roberts Dep. at 10-13 (ECF 40 Ex. 1). The same three tenants continue to lease Roberts' property: (1) Plaintiff Zapata's car repair shop; (2)

---

[1] Plaintiffs' initial complaint alleged that Roberts purchased the property "on or about November 2021." Civil Action Compl. ¶ 8 (ECF 1). The amended complaint alleges the purchase was "in or around 2017." First Amend. Compl. ¶ 8 (ECF 7). At his deposition, Roberts confirmed: "It would have been closer to '17." Roberts Dep. at 26:20-21.

Roberts' battery reconditioning company; and (3) an online auto parts sales shop. *Id.* at 14:16-16:10. Zapata's shop performs car inspections, repairs, and restorations. Zapata Dep. at 15:17 (ECF 40 Ex. 9). Both Zapata's shop and the online parts shop regularly keep cars on the premises overnight. *Id.* at 13:10.

In 2021, several noise complaints prompted Donna Czeiner, the Borough's Zoning and Code Compliance Officer (now retired), to inspect Roberts' property. Czeiner Dep. at 19-21 (ECF 48 Ex. G) (referring to at least two neighbors complaining, one of whom repeatedly called the Borough); Jan./Feb. 2021 Borough Emails at 2 (ECF 48 Ex. J) (same). Following her inspection, Czeiner notified Roberts that his property was in violation of several local ordinances, as well as an order issued after a 1998 violations hearing which placed certain conditions on the use of the property.[2] Czeiner Jan. 11, 2021, Letter (ECF 40 Ex. 3). Czeiner concluded Roberts' battery company was in violation of several conditions of the 1998 decision, including work taking place on the weekends, allowing deliveries outside of permitted hours, loading and use of machinery outside of the building, and improper parking. *Id.* Czeiner also found Zapata's shop in violation of several local ordinances, which prohibited service and repair outside of a building, drive-

---

[2] The 1998 zoning hearing decision is not part of the record before me. Plaintiffs provide several exhibits where the Borough describes the decision, but do not otherwise provide the original copy. *See* ECF 48 Ex. J at 7 (describing the 1998 decision as permitting the change of use from a feed mill to a recycling center "with conditions"); *see also* Czeiner Jan. 11, 2021, Letter (noting a copy of the 1998 decision was enclosed with the original letter). The parties disagree about the Borough's enforcement of the decision prior to Roberts' purchase of the property. Roberts contends that the Borough did not enforce the 1998 decision "for 25 years." Roberts Dep. at 35:9; 38:23. Czeiner testified that her predecessors communicated with the property's previous owners to achieve compliance with it. Czeiner Dep. at 62:13-63:7.

But aside from its enforcement, Plaintiffs do not contest the substance of the 1998 decision. *See generally* First Amend. Compl.; Resp. at 9-10 (ECF 48) (referring to the decision but otherwise merely arguing that the "Borough did not make the same monumental effort to find violations against other [white]-owned auto businesses"). Most importantly, as discussed below, it formed part of the Borough's enforcement actions here and was addressed as part of the settlement of the civil action against Roberts. As such, for purposes of the present Motion, I accept the Borough's description of the decision and its applicability to Plaintiffs as successors in interest to the property.

through service resulting in vehicle backups, exterior vehicle storage being visible from adjoining residential properties, storage of unlicensed vehicles, vehicles for repair not removed promptly, and keeping junk vehicles on site which would block emergency vehicles from accessing the inner property, among other violations.  *Id.*

Having received no response from Roberts to the original notices,[3] Czeiner followed up with two violation notices detailing the property's persisting violations.  Czeiner Dep. at 23:5; Czeiner February 8, 2021, Letter (ECF 40 Ex. 3); Czeiner June 1, 2021, Letter (ECF 40 Ex. 5).  The violation notices also warned Roberts that continued noncompliance would result in additional fines and a civil action.  *Id.*

A series of communications and meetings ensued to reinspect the property and discuss remedying the violations.  At one of these meetings, Roberts alleges he overheard Czeiner tell her attorney, "[W]e need to get these kind of people to move out so more don't move in."  Roberts Dep. at 19:1-19:6.  Roberts believes Czeiner's comment proved the Borough was targeting Zapata not because of the nature of his business, but because "he's Spanish."[4]  *Id.*  Czeiner denies having

---

[3] Even where individual tenants are in violation of local ordinances, the Borough directs all communications, including violation notices and fines, to the property owners only.

[4] Roberts also claims the Borough is "very concerned about the influx of minorities."  Roberts Dep. 29:2.  He bases this belief on "different people" he has talked to, including a former salesman who purportedly heard it said by the mayor.  *Id.* at 29:14-30:4.  Roberts does not otherwise substantiate this claim.  Similarly, Zapata alleges the Borough wants to emulate a neighboring town that is not racially diverse and that Czeiner told him the Borough is forcing her to be discriminatory (by fining him unnecessarily).  Zapata Dep. at 20-23.  Zapata was otherwise unwilling to provide the names of people whom he contended made such statements.  *Id.* at 23-24; 28-29; 50-51; 77.  I recognize that in any equal protection case a plaintiff faces challenges identifying comparators, especially with a subject as sensitive as racism, which people might understandably hesitate to discuss.  But a party cannot rely on inadmissible hearsay to defeat summary judgment.  *Smith v. City of Allentown,* 589 F.3d 684, 693 (3d Cir. 2009).

3

heh
this

made such a comment.  She testified that Roberts accused her of picking on him and became verbally aggressive.[5]  Czeiner Dep. at 57:2; 30.

Over the next few months, as Czeiner admits, Roberts cured some of the violations.  *Id.* at 30:17.  Despite these efforts, several issues persisted, prompting Czeiner to file a civil action in county court.  Czeiner Dep. at 31-32.  The civil action sought $12,000 from Roberts for seven ongoing violations under local ordinances and the 1998 decision, including:

1. Failure to maintain a clear path within the property for thru-truck traffic
2. Failure to provide bathroom facilities
3. Parking/storing vehicles outside of designated areas
4. Failure to remove discarded tires and parts from the exterior premises
5. Failure to screen a property line adjacent to a residential zone
6. Failure to remove junk vehicles
7. Storing unlicensed vehicles and failure to repair and remove promptly unlicensed, uninspected, unregistered, and/or hazardous vehicles that have been onsite for months

Lancaster Civil Compl. (ECF 40 Ex. 7).  In late 2022, Roberts and the Borough reached a settlement, with the Borough agreeing to defer the requirement for a bathroom facility for a few years.  The Borough also agreed to withdraw its civil action upon Roberts' "satisfactory resolution of the exterior property issues."[6]  Settlement Agreement at 2, 4 (ECF 46 Ex. 8).  Soon thereafter, Roberts and Zapata filed this action.  The amended complaint asserts only an equal protection and a *Monell* claim against the Borough and Czeiner.

---

[5] It is clear from the record before me that the parties developed a tumultuous relationship over the course of several months.  But the question before me is not whether there was bad blood between the parties, but rather whether there is a violation of federal civil rights.

[6] Plaintiffs object to the inclusion of the settlement agreement "as a fact," arguing it is irrelevant, privileged, and inadmissible as a subsequent remedial measure.  ECF 48 at 13-14.  Given the nature of the dispute here, its relevance is self-evident, and Plaintiffs' objections to its admissibility lack merit as a matter of law.

**II.     Legal Standard**

Motions for summary judgment are governed by the well-established standard set forth in Fed. R. Civ. P. 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.    Discussion**

"To bring a successful claim under 42 U.S.C. § 1983 for denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated. . . . Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant respects." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (cleaned up). "Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry." *Chan v. Cnty. of Lancaster*, No. 10-3424, 2011 WL 4478283, at *15 (E.D. Pa. Sept. 26, 2011) (citing *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir.2004)).

Plaintiffs argue that Defendants treated them differently by selectively citing Hispanic-owned businesses, but not similarly situated white-owned businesses. Resp. at 5-14. This argument is premised on the theory that the Borough fined Roberts, who is white and owns the property, to get him to push out Zapata, who is Hispanic and was committing the violations. At the outset, this theory is weak for several reasons.

For one, the Borough's fines did not stem exclusively from Zapata's car shop. In fact, Czeiner's initial letter to Roberts identified issues with his own battery replacement company, as well as Zapata's car repair shop. Czeiner Jan. 11, 2021, Letter. It also identified issues pertaining to Roberts' sole duties as the landlord, such as the provision of bathroom facilities and a fence adjacent to residential properties. *Id.* Moreover, although Plaintiffs point to the Borough's emails as "conspiring" to fine Roberts, the emails merely discuss the Borough's handling of neighbors'

5

noise complaints, how much weight they can be given based on the level of documentation, and other ongoing violations that Czeiner identified. Jan./Feb. 2021 Borough Emails. For that matter, the very existence of the neighbors' complaints establishes that the Borough had a reasonable basis for investigating Roberts' property and Zapata's shop. Responsiveness to community concerns characterizes the work of a good code enforcement officer. And nothing in the correspondence focuses on Zapata's ethnicity.[7]

Plaintiffs also fail to present sufficient evidence from which a jury could find materially different treatment. The parties deposed four property and shop owners: (1) Jay Shelley, a white owner of a property leased to four car-related businesses; (2) Daniel Ortiz, a Hispanic mechanic shop owner and Shelley's tenant; (3) Philip Fiore, a white auto sales lot owner; and (4) Adam Jannone, a white car shop owner. Plaintiffs argue that Shelley and Ortiz had a similar experience, with the Borough fining Shelley "as the landlord of Ortiz' business and because of his association with Ortiz." Resp. at 12. Plaintiffs then compare these experiences with those of Fiore and Jannone, who received few, if any, violations from the Borough. Id. at 13.

Plaintiffs are similarly situated to Shelley and Ortiz in some respects, but only to a limited degree, and in most respects, they are not similarly situated to Fiore and Jannone. Like Roberts, Shelley leases his property to multiple businesses: a "recon shop"; a body and auto paint shop; Ortiz' mechanic shop; and an "illegitimate business" consisting of a three-bay garage with storage. Shelly Dep. at 9-10 (ECF 49 Ex. D). Except for Ortiz, all of Shelley's tenants are white. Moreover, as with Roberts, Shelley received violations for the actions of both white and Hispanic tenants.[8]

---

[7] The parties disagree as to whether Czeiner was even aware of Zapata's ethnicity. Zapata alleges he informed Czeiner he was of Puerto Rican descent early in their conversations. Czeiner denies that she knew that he is Hispanic. At Zapata's deposition, he testified that some may recognize his ethnicity based on his last name, while others come into his shop and may just "recognize that, but the majority does not." Zapata Dep. at 17.

[8] Shelley received fines for two of the shop owner's actions, Ortiz and the owner of the apparently illegal garage. Shelley Dep. at 11:5. Shelley did not receive violations as to the recon shop, even though it had more vehicles on site

Plaintiffs are not similarly situated to either Fiore or Jannone. Fiore owns an auto sales lot, where cars are expected to remain in inventory for some period of time. He has received violations for high grass in the past, but nothing related to the vehicles on his lot. *Id.* 9-10; 29-30. According to Fiore, the Borough gave him a warning about not parking his cars with the bumpers over the cement, but he resolved the issue. *Id.* at 24-26; 29-30. Although the cars he sells can remain on the lot for several months, his business, unlike Zapata's business, does not involve repairs or other types of body work, so there is far less traffic in the form of vehicles coming and going.[9] *Id.* at 8-9. This difference is particularly relevant in that the Borough's inspection was prompted by noise complaints, which are much more likely to arise with repair shops, and some of the violations the Borough identified stemmed specifically from Zapata's service and repair work.

Jannone's property includes both a small sales lot and a garage where he performs services and repairs. Jannone Dep. at 7-8 (ECF 48 Ex. F). According to Jannone, the Borough has not inspected his property or given him a violation in the last few years, but there is no evidence of any public complaints. *Id.* at 9 (explaining his shop is like Zapata's, except that his own cars are "neat and oriented like soldiers"). Another distinction is that Jannone's business is the only one on the property, whereas Roberts and Shelley's properties house multiple car-related businesses, giving rise to additional issues with traffic, street access, and emergency vehicle access. Czeiner Dep. at 40-43.

Roberts and Shelley's property are also uniquely situated in the Borough in that they were subject to additional conditions on the use of their property as a result of violation proceedings.

---

than Ortiz' shop. *Id.* at 12:16. But Shelley explained the discrepancy as due to the recon shop servicing its vehicles faster, whereas Ortiz' vehicles "sit[] there on the property until he gets to work on them." *Id.* at 13.

[9] Plaintiffs deposed Fiore about another one of his businesses that does auto body work on unregistered cars, for which he has not received any violations. Fiore Dep. at 27-28. This shop, however, is outside of the Borough and therefore not similarly situated for purposes of Plaintiffs' claims.

7

Czeiner Dep. at 45.  And as to Roberts specifically, the 1998 decision was the basis for several of his violations.  *See, e.g.*, Lancaster Civil Compl.

In summary, Plaintiffs have failed to identify similarly situated businesses that were treated differently.  Although there remain some disputes as to whether Czeiner made statements that might reflect ethnic bias on her part or the part of Borough officials, to prevail on an equal protection claim, a plaintiff must establish that such unlawful animus resulted in different treatment.  No reasonable juror could find that the Borough treated Roberts and Zapata differently in a material way.  For several months, the Borough worked with Roberts in attempting to obtain compliance.  Czeiner Dep. at 22-25.  This process included several meetings and inspections, initial notification of the violations, formal violation notices, and even a settlement to resolve the civil action at the county level.  The Borough's persistent efforts to bring Roberts into compliance flatly contradict the central premise of Plaintiff's case – that the Borough was determined to oust Zapata.  And though the other property owners never suffered the more serious consequence of a civil action against them, there is evidence the Borough gave at least some of them warnings and violations.  *See, e.g.*, Fiore Dep. at 9-10, 20-21, 29-30.  Roberts, unlike other property owners, did not remedy all his violations.[10]

Based on the numerous dissimilarities between Plaintiffs and other property owners, the unique status of Roberts' property as subject to prior limitations on use, and ample evidence that

---

[10] The record before me is also replete with subplots.  One of them is Zapata's allegations that the Borough is also trying to get him evicted from his personal residence by removing his landlord – Jay Shelley's – rental permit.  According to Zapata, at the same time Czeiner began inspecting his shop, she inspected his rental home and found it to be in violation of a local ordinance prohibiting bedrooms in basements.  There is, however, no suggestion that basement apartments are lawful under the prevailing local code.  Another subplot is that Roberts purportedly withheld from Czeiner the national origin of the third tenant at his property, who is also Hispanic.  Roberts uses this to argue that the only reason Czeiner did not cite him as to that tenant is because she believed the tenant was white.  Even considering these additional speculative allegations, they would not establish disparate treatment.

the Borough worked with the parties for several months to obtain compliance, I conclude that no reasonable juror could find an equal protection violation.[11]

## IV. Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted as to all counts. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[11] Plaintiffs also bring a *Monell* claim, arguing that Defendants "had in place a custom or policy, which directly caused constitutional deprivation." Resp. at 15. Because Plaintiffs' only basis for a constitutional deprivation fails, their *Monell* claim necessarily fails, as well. *Hill v. Borough of Kutztown,* 455 F.3d 225, 245 (3d Cir. 2006).